UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HARRY A. RUMIS, JR., et al. | ) | Civil No. 05cv1758 J (NLS) |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| BRADY WORLDWIDE, INC., | ) ) | |
| Defendant. | ) ) | |

Before the Court is Defendant Brady Worldwide, Inc.'s ("Defendant") Motion for Summary Judgment. [Doc. No. 35.] Plaintiffs Harry A. Rumis, Jr., Edith Jean Rumis, Anthony J. Rubino, and Elizabeth C. Rubino ("Plaintiffs") have filed an opposition. [Doc. No. 46.] The issues presented are decided without oral argument. *See* S.D. Cal. Civ. R. 7.1.d.1 (2006). For the reasons set forth below, the Court **GRANTS** Defendant's Motion for Summary Judgment in its entirety.

*Background*

At issue in the instant motion is whether Defendant had an obligation to market Plaintiffs' products through Defendant's various channels of distribution and, if so, whether Defendant breached that obligation. Defendant Brady Worldwide is a Wisconsin corporation and a subsidiary of Brady Corporation. (Def.'s Statement of Undisputed Facts ("SUF") ¶ 1.) Brady

Corporation is a publicly traded entity whose products include labels and signs, printing systems and software, label-application and data-collection systems, safety devices, and precision die-cut materials. (*Id.* ¶ 2.) In January 2003, Defendant acquired TISCOR, a California corporation. (Compl. ¶¶ 10, 11.) TISCOR provides mobile software systems and hardware used by technicians to perform inventory and safety inspections. (*Id.* ¶ 10.) Plaintiff Harry A. Rumis, Jr. was president and CEO of TISCOR prior to its acquisition by Defendant. (Def.'s SUF ¶ 4.) Mr. Rumis had a 50 percent ownership interest in TISCOR. (*Id.*) Plaintiff Anthony Rubino was executive vice president of TISCOR prior to its acquisition by Defendant and owned the other 50 percent interest in TISCOR. (*Id.* ¶ 5.)

On January 17, 2003, Plaintiffs and Defendant entered into a Stock Purchase Agreement ("Agreement"). (*Id.* ¶ 9.) In the Agreement, Defendant agreed to purchase from Plaintiffs all of TISCOR's outstanding capital stock. (*Id.*) Plaintiffs received almost $13,000,000 from this transaction. (*Id.*) The Agreement contained an integration clause that read as follows:

> This Agreement and the documents referred to herein and to be delivered pursuant hereto constitute the entire agreement between the parties pertaining to the subject matter hereof, and supersedes all prior contemporaneous agreements, understandings, negotiations, and discussions of the parties, whether oral or written, and there are no warranties, representations, or other agreements between the parties or on which any of the parties have relied in connection with the subject matter hereof, except as specifically set forth in this Agreement. . . .

(Agreement § 5.7.)

Central to the parties' dispute is the Agreement's earn-out provision. Under the provision, Plaintiffs would receive additional payments totaling up to $3 million if TISCOR reached certain revenue thresholds during the first two years after acquisition. (Def.'s SUF ¶ 18.) The earn-out provision for the first year after acquisition was as follows:

> In the event that (A) the Revenues[1] for the First Applicable Period[2] exceed $11,700,000 and (B) the EBIT[3] for the First Applicable Period exceeds $2,250,000;

---

[1] "Revenues" are defined in the Agreement as TISCOR'S "gross revenues less allowances, returns and discounts." Agreement § 2.2.

[2] The "First Applicable Period" commenced January 1, 2003 and ended December 31, 2003. Agreement § 2.2.

[3] "EBIT" is defined as TISCOR's "net income plus all interest expense and income taxes incurred less all interest income and income tax benefits recorded." Agreement § 2.2.

> then Buyer shall pay Sellers an amount equal to $1.00 for each $1.00 by which the EBIT for the First Applicable Period exceeds $2,250,000.

(Agreement § 2.2.) The earn-out provision for the second year after acquisition was as follows:

> In the event the Eligible Revenues for the Second Applicable Period[4] equal or exceed $13,500,000, the Buyer shall pay Sellers an amount equal to the Gross Profit during the Second Applicable Period from sales to Certain Customers.[5]

(*Id.*) The revenue benchmarks set forth in the earn-out provision were less than the projected revenues for 2003 and 2004 that Plaintiffs had submitted to Defendant prior to the acquisition. (Def.'s SUF ¶ 22.) Specifically, Plaintiffs projected that if TISCOR continued to operate on a standalone basis, it would realize $14.5 million in revenues in 2003 and $20.2 million in revenues in 2004. (*Id.*) Presentations TISCOR made to other potential buyers also set forth revenue projections exceeding those contained within the earn-out provision. (*Id.*)

In connection with the execution of the Agreement, Mr. Rumis and Mr. Rubino entered into separate employment agreements with Defendant in which they agreed that they would continue to run the day-to-day operations at TISCOR for two years after the acquisition. (*Id.* ¶ 11.) The employment agreements were incorporated by reference into the Agreement. (*Id.* ¶ 15.) Mr. Rumis agreed to be responsible for "the day-to-day affairs of [TISCOR] and to assist Buyer with the coordination of [TISCOR], as appropriate, with other Buyer operations." (Rumis Employment Agreement § 3(a).) Mr. Rubino agreed to manage "the day-to-day affairs of [TISCOR's] sales and marketing functions, manage [TISCOR's] 'house' accounts and to assist Buyer with the coordination of [TISCOR's] sales and marketing activities, as appropriate, with the sales and marketing activities of other Buyer operations." (Rubino Employment Agreement § 3(a).) The employment agreements also provided that Mr. Rumis and Mr. Brady would receive base salaries of $150,000 per year and guaranteed annual bonuses totaling 50 percent of the base salary. (Def.'s SUF ¶ 14.)

---

[4] The Second Applicable Period commenced January 1, 2004, and ended December 31, 2004. Agreement § 2.2.

[5] "Certain Customers" are defined as "Simon Properties, General Electric and their Affiliates." Agreement § 2.2.

In early 2003, Brady Corporation underwent a significant reorganization, and the sales teams of two of Brady's divisions were merged and reduced. (Pl.'s Statement of Material Facts (SMF) ¶ 54.) TISCOR was not included in this reorganization. (*Id.* ¶ 27.) According to Plaintiffs, as a result of the reorganization, Defendant began to focus its efforts on its core businesses, rather than working with Plaintiffs to promote TISCOR's products. (*Id.* ¶ 25.) Plaintiffs assert that Defendant's reorganization and renewed focus on its traditional product lines made it impossible for TISCOR to achieve the revenue benchmarks set forth in the earn-out provision. (*Id.*) TISCOR, in fact, failed to reach the revenue thresholds set forth in the earn-out provision by several million dollars. (*Id.* ¶ 23.) Revenues for TISCOR were less than $7 million in both 2003 and 2004, and Plaintiffs therefore did not qualify for an earn-out. (*Id.*) The parties disagree as to the reasons why TISCOR failed to reach the revenue benchmarks. Defendant asserts that TISCOR failed to reach the benchmarks due to the economy and TISCOR's deteriorating base business. (Mot. for Summ. J. at 22.) Plaintiffs assert that TISCOR's failure to meet revenue thresholds was "attributable to the lack of integration, focus and direction from [Defendant] to TISCOR after the acquisition." (Opp'n to Mot. for Summ. J. at 16.) In September 2004, Plaintiffs left TISCOR. (Def.'s SUF ¶ 71.)

The parties' dispute revolves around the degree to which Defendant marketed TISCOR's products through Defendant's various channels of distribution. Defendant distributed marketing materials concerning TISCOR's products to its sales force, and Plaintiffs made presentations to Defendant's personnel regarding TISCOR's products. (*Id.* ¶ 37.) Defendant hired a manager to work with TISCOR to market its products through Brady Corporation. (*Id.* ¶ 57.) However, Defendant imposed no quotas for sales of TISCOR's products upon its sales force. (Pl.'s SMF ¶ 81.) Defendant did not provide monetary incentives to its representatives in Canada, Australia, or Europe to sell TISCOR's products. (*Id.* ¶ 62.) The parties do not dispute that the Agreement, on its face, contains no explicit language stating that Defendant's sales force would market TISCOR's products. (*See* Def.'s SUF ¶¶ 33, 43; Opp'n to Mot. for Summ. J. at 8.)

On September 12, 2005, Plaintiffs filed a Complaint in state court containing a single cause of action alleging that Defendant violated the implied covenant of good faith and fair

dealing as defined under Delaware law. (Compl. ¶ 22.) Specifically, Plaintiffs contend that by agreeing to provide deferred compensation conditioned upon TISCOR's revenues reaching certain benchmark levels, Defendant obligated itself to refrain from actions that would make it impossible to obtain the revenue benchmarks. (*Id.*) Plaintiffs further allege that Defendant had an affirmative obligation to act in such a manner as to increase any probability that TISCOR might achieve benchmark revenues. (*Id.*) On September 12, 2005, Defendant removed Plaintiffs' action to this Court on the basis that diversity jurisdiction existed between the parties pursuant to 28 U.S.C. § 1332. [Doc. No. 1.] On March 29, 2007, Defendant filed the instant Motion for Summary Judgment, and Plaintiffs filed an Opposition. [Doc. Nos. 35, 46.]

## *Legal Standard*

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure on "all or any part" of a claim where there is an absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, the fact might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. When making its determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. If the moving party does not bear the burden of proof at trial, it need not produce evidence to negate the non-moving party's claim, but rather can satisfy the initial burden by demonstrating that the non-moving party failed to establish an essential element of that party's case. *See id.* at 322-23.

If the moving party meets the initial burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 250. It is insufficient for the party opposing summary judgment to "rest upon the mere allegations or denials of [his or

her] pleading." Fed. R. Civ. P. 56(e). Rather, the party opposing summary judgment must "by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56). The Court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). "[T]he district court may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).

## *Discussion*

The parties do not dispute that, pursuant to the terms of the Agreement, Delaware law governs this action. (*See* Agreement § 5.9.) Plaintiffs assert two basic theories under Delaware's implied covenant of good faith and fair dealing. First, Plaintiffs assert that Defendant had an affirmative obligation to market TISCOR's products. (*See* Opp'n to Mot. for Summ. J. at 3.) Second, Plaintiffs assert that Defendant's conduct made it impossible for Plaintiffs to achieve the revenue benchmarks set forth in the earn-out agreement. (*Id.*) For the reasons set forth below, the Court **FINDS** that there is no genuine dispute of material fact that Defendant did not violate the implied covenant of good faith and fair dealing.

**I. Delaware Law Regarding the Implied Covenant of Good Faith and Fair Dealing**

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract." *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999). The implied covenant of good faith and fair dealing requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (citations omitted). The implied covenant is "designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Chamison*, 735 A.2d at 920. Parties breach the covenant when "their conduct frustrates the 'overarching

purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap*, 878 A.2d at 442 (citations omitted).

The Delaware Supreme Court has recognized "the occasional necessity" of implying contract terms to ensure the parties' "reasonable expectations" are fulfilled. *See id.* This quasi-reformation, however, "should be [a] rare and fact-intensive" exercise, governed solely by "issues of compelling fairness." *See id.* (citations omitted). The implied covenant will arise "[o]nly when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter.' " *Id.* (quoting *Katz v. Oak Indus.*, 508 A.2d 873, 880 (Del. Ch. 1986)). The covenant "cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." *Chamison*, 735 A.2d at 921. Courts will not rewrite contractual language "just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006).

**II. Fraud, Misrepresentation, and Deceit Standard v. Bad Faith Standard**

As a preliminary matter, the Court must determine whether, in addition to the features of the implied covenant of good faith and fair dealing described above, Plaintiffs are also required to establish fraud, misrepresentation, or deceit. Defendant alleges that Delaware courts have found that a plaintiff must establish fraud, deceit, or misrepresentation to prevail on a claim for breach of the covenant. (Mot. for Summ. J. at 19.) Plaintiffs assert that the Delaware Supreme Court has not imposed a fraud, deceit, or misrepresentation requirement in cases involving commercial contracts. (Opp'n to Mot. for Summ. J. at 23.)

The Delaware Supreme Court has not indicated whether, in the context of a commercial contract, a claim for breach of the implied covenant of good faith and fair dealing requires proof of fraud, deceit, or misrepresentation. In *Merrill v. Crothall-American, Inc.*, the Delaware Supreme Court held that in employment-at-will contracts, the conduct of an employer must constitute fraud, deceit, or misrepresentation in order for an employee to establish a breach of the implied covenant. 606 A.2d 96, 101 (Del. 1992). However, outside the narrow context of

employment-at-will contracts, the Delaware Supreme Court has not required fraud, deceit, or misrepresentation to establish a breach of the implied covenant. In *Dunlap v. State Farm Fire and Casualty Co.*, a case decided after *Merrill* that involved an insurance contract, the Delaware Supreme Court did not require the plaintiff to demonstrate fraud, deceit, or misrepresentation to establish a breach of the implied covenant. *See* 878 A.2d at 442. Rather, the court stated that "the term 'good faith' has no set meaning, serving only to exclude a wide range of heterogeneous forms of bad faith." *Id.* (citations omitted). The court further stated that parties breach the implied covenant when "their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.* Because there is no indication that the Delaware Supreme Court would require a party to demonstrate fraud, deceit, or misrepresentation to establish a breach of the implied covenant in a commercial contract, the Court **FINDS** that a plaintiff need not establish this type of conduct in order to prove a breach of the implied covenant under Delaware law. *See O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188, 1202-03 (finding that in the context of a commercial contract, the Delaware Supreme Court likely would find that a breach of the implied covenant can occur in the absence of fraud, deceit, or misrepresentation). Rather, to establish a breach of the implied covenant, a plaintiff must set forth facts demonstrating that the defendant acted in bad faith. *See id.* at 1202.

**III. The Implied Covenant and Earn-Out Agreements**

There is little case law applying Delaware's implied covenant in the context of an earn-out agreement, the type of agreement at issue in instant case. In *O'Tool*, the Tenth Circuit upheld the district court's finding that the defendant violated Delaware's implied covenant of good faith and fair dealing by acting in bad faith to prevent the plaintiff from receiving earn-out consideration. *Id.* at 1197. The defendant, a large boat manufacturer, bought the plaintiff's boat manufacturing business under a purchase agreement that included earn-out consideration. *Id.* at 1191. The plaintiff's business became a subsidiary of defendant's corporation, and the earn-out provision was conditioned upon the subsidiary meeting or exceeding certain gross revenue goals. *Id.* After the acquisition, the defendant changed the brand name of plaintiff's boats, which

negatively impacted their marketability; ordered plaintiff to give priority to manufacturing boats which were much more expensive to make, thereby resulting in lower profits; required plaintiff to bear the costs of designing and producing a new line of boats; and eventually closed plaintiff's manufacturing facility. *Id.* at 1192. As a result, plaintiff's gross revenues and production failed to meet the earn-out requirements. *Id.* at 1193. The plaintiff claimed that the defendant breached the implied covenant of good faith and fair dealing by intentionally impairing its realization of the earn-out agreement. *Id.* at 1195. The Tenth Circuit found that the spirit of the earn-out agreement dictated that plaintiff be given a fair opportunity to operate the subsidiary in such a fashion as to maximize the earn-out consideration. *Id.* at 1197. With that spirit in mind, the court concluded that a reasonable trier of fact could have found that the parties would have proscribed defendant's actions had they contemplated them during the contract negotiations. *Id.* There was "ample evidence" that the defendant had ulterior motives for acquiring the plaintiff's business, including a desire to remove a competitor from the market. *Id.* The court thus upheld the district court's finding that the defendant violated the implied covenant of good faith and fair dealing by preventing the plaintiff from realizing any earn-out consideration. *Id.*

## IV. Application

The overarching theme of the breach of implied covenant theory asserted by Plaintiffs is that "by agreeing to provide Plaintiffs with deferred compensation conditioned upon TISCOR's revenues reaching certain benchmark levels, the Defendant (through the implied covenant of good faith and fair dealing) obligated itself to refrain from actions that would make it impossible to obtain the revenue benchmarks, and affirmatively obligated itself to act in such a manner as to increase any probability that TISCOR might achieve the benchmark revenues." (Compl. ¶ 22.) In particular, Plaintiffs assert that Defendant had an obligation to integrate TISCOR's products into Defendant's product line by sale of such products through Defendant's various channels of distribution. (Opp'n to Mot. for Summ. J. at 3.) Plaintiffs argue that Defendant's "virtual abandonment of product integration . . . would have been proscribed by the parties had it occurred to them when they were negotiating the Agreement." (*Id.*) Plaintiffs cite several facts in support of their claim that Defendant violated the implied covenant, including (1) Defendant

never made a serious attempt to market TISCOR's products through Defendant's sales force to Defendant's customers; (2) Defendant did not appoint a manager to assist in integrating TISCOR's and Defendant's product lines until five months after the parties executed the earn-out agreement; (3) Defendant provided no tangible incentive to its representatives in Canada, Australia, or Europe to sell TISCOR's products; and (4) Defendant imposed no quotas for sales of TISCOR's products upon Defendant's sales force. (Opp'n to Mot. for Summ. J. at 8-14.)

Defendant asserts that there are no facts supporting a finding that it acted in bad faith or prevented Plaintiffs from selling or manufacturing their products. (Mot. for Summ. J. at 22.) Defendant argues that nothing in the Agreement explicitly addressed the distribution of TISCOR's products by Defendant, and that Plaintiffs' ability to obtain an earn-out depended solely upon the financial performance of TISCOR. (*Id.* at 6.) Defendant also disputes Plaintiffs' claim that it made no efforts to market TISCOR's products through its sales force. (*Id.* at 11.) Finally, Defendant argues that it acquired Plaintiffs' business to expand its product line and make money, and there was no incentive for Defendant to cause Plaintiffs to miss their revenue targets. (*Id.* at 25.)

The Court now examines the two basic theories Plaintiffs set forth in support of their claim that Defendant breached the implied covenant of good faith and fair dealing. First, Plaintiffs assert that Defendant had an affirmative obligation to market TISCOR's products. (*See* Opp'n to Mot. for Summ. J. at 3.) Second, Plaintiffs assert that Defendant's conduct made it impossible for Plaintiffs to achieve the revenue benchmarks set forth in the earn-out agreement. (*Id.*)

**A. Whether Defendant Was Obligated to Market TISCOR's Products**

The Court first examines Plaintiffs' claim that Defendant had an affirmative obligation to market TISCOR's products. To invoke the implied covenant, it must be clear from the parties' Agreement that they would have agreed that Defendant had an obligation to market TISCOR's products through its distribution channels had the parties thought to negotiate with respect to that matter. *See Dunlap*, 878 A.2d at 442. As a result, the Court must determine whether there is a genuine dispute of material fact as to whether the express terms of the Agreement indicate that

the parties would have agreed to this obligation had they negotiated the issue. The Court thus reviews the specific provisions of the Agreement to determine whether it is apparent that the parties, had they negotiated with Defendant's marketing obligations in mind, would have agreed to require Defendant to sell TISCOR's products through Defendant's various channels of distribution.

The Court first examines the Agreement's earn-out provisions. It is by no means clear from the language of these provisions that, had they negotiated the issue, the parties would have agreed that Defendant was obligated to market TISCOR's products. The provisions contain no language whatsoever stating that Defendant's sales force would market TISCOR's products. In fact, the provisions contain absolutely no indication as to whether TISCOR was expected to reach the revenue benchmarks as a standalone business without Defendant's assistance, or whether TISCOR was expected to achieve the benchmarks with the help of Defendant's sales force. The provisions simply set forth the revenue benchmarks that TISCOR would be required to achieve for Plaintiffs to receive deferred compensation. (*See* Agreement § 2.2.) Although Plaintiffs assert that, prior to the acquisition, the parties regularly discussed the marketing of TISCOR's products by Defendant's sales force, the Court cannot rewrite the parties' agreement "just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process." *See Allied Capital Corp.*, 910 A.2d at 1033. Because the earn-out provisions are silent as to Defendant's role in the sales of TISCOR's products, no reasonable finder of fact could conclude that these provisions clearly indicate that the parties expected that Defendant would be obligated to market the products.

The Court next examines Mr. Rumis' and Mr. Rubino's employment agreements, which were incorporated by reference into the Stock Purchase Agreement. Again, it is by no means clear from the language of these agreements that, had they negotiated the issue, the parties would have agreed that Defendant was obligated to market TISCOR's products. Mr. Rumis' agreement stated that he would "assist Buyer with the coordination of [TISCOR], *as appropriate*, with other Buyer operations." (Rumis Employment Agreement § 3(a) (emphasis added).) Mr. Rubino's agreement stated that he would "assist Buyer with the coordination of [TISCOR's]

sales and marketing activities, *as appropriate*, with the sales and marketing activities of other Buyer operations." (Rubino Employment Agreement § 3(a) (emphasis added).)  Although the plain language of Mr. Rubino's agreement states that TISCOR and Defendant would coordinate marketing activities "as appropriate," this language, on its face, does not mandate that Defendant market TISCOR's products.  Rather, the words of the employment agreement, given their ordinary meaning, indicate that there was a possibility that the parties would market TISCOR's products together if it was "appropriate" to do so.  While it appears that the parties contemplated the possibility of Defendant and TISCOR marketing their products together, the language of the employment agreements alone is insufficient to give rise to an inference that Defendant was obligated to market TISCOR's products.

The existence of an integration clause in the Agreement further supports the conclusion that Defendant was not obligated to market TISCOR's products.  Plaintiffs assert that, prior to Defendant's acquisition of TISCOR, the parties regularly discussed how they would work together to sell TISCOR's products. (Opp'n to Mot. for Summ. J. at 5.)  However, the integration clause provides that the Agreement "supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions of the parties, whether oral or written." (Agreement § 5.7.)  The integration clause further states that "there are no warranties, representations, or other agreements between the parties or on which any of the parties have relied in connection with the subject matter hereof, except as specifically set forth in this Agreement." (*Id.*)  Finally, the integration clause states that no amendment to the Agreement would be binding "unless executed in writing by the parties to be bound thereby." (*Id.*)  The plain language of the integration clause states that the parties would be bound only to the terms set forth in the Agreement.  The integration clause thus bars the Court from inferring that Defendant had an obligation to market Plaintiff's products based upon oral negotiations that took place before the Agreement was executed.

The Court acknowledges that Plaintiffs have cited several facts supporting their contention that Defendant made little effort to market TISCOR's products, including the fact that Defendant imposed no sales quota for TISCOR products on its sales staff and that Defendant

provided no tangible incentive to its representatives in Canada, Australia, or Europe to sell the products. However, without a clear indication in the parties' Agreement that the parties intended to obligate Defendant to market the products, the Court cannot hold Defendant liable for failing to do so. In sum, after examining the earn-out provisions and the employment agreements, the Court **FINDS** that no reasonable trier of fact could conclude that it is clear from the parties' Agreement that they would have agreed that Defendant had an obligation to market TISCOR's products had they negotiated the issue.

### B. Whether Defendant Acted in Bad Faith to Prevent Plaintiffs from Receiving Earn-Out Consideration

Although the Court finds nothing in the parties' Agreement indicating that Defendant had an affirmative obligation to market TISCOR's products, Defendant can still be held liable for violating the implied covenant of good faith and fair dealing if Defendant acted in bad faith to prevent Plaintiffs from achieving the revenue benchmarks set forth in the earn-out provisions. *See O'Tool*, 387 F.3d at 1202-03. In general, the spirit of an earn-out agreement dictates that the seller be given a fair opportunity to operate his or her business in such a fashion as to maximize the earn-out consideration. *See id.* at 1197. The Court thus examines whether Plaintiffs have established a genuine dispute of material fact as to whether Defendant acted in bad faith to make it impossible for Plaintiffs to obtain the revenue benchmarks.

Plaintiffs allege that due to the reorganization of Brady Corporation, the corporation began to focus on its traditional product line, rather than promoting technology acquisitions such as TISCOR. (Opp'n to Mot. for Summ. J. at 17-18.) Plaintiffs further state that the alleged lack of support for TISCOR "is indicative of a decision . . . to not pay any additional sum for the TISCOR acquisition." (*Id.* at 18.) According to Plaintiffs, "[t]hrough its actions, Brady has destroyed what was–prior to acquisition–a profitable, thriving and growing business." (*Id.* at 1.) However, Plaintiffs fail to establish a genuine issue of fact regarding this claim, as there is no evidence upon which a rational trier of fact may base an inference of bad faith. Plaintiffs do not point to any allegedly "oppressive or underhanded tactics" employed by Defendant to thwart the spirit of the agreement. *See Chamison*, 735 A.2d at 920. Although Plaintiffs assert that

TISCOR was harmed by Defendant's reorganization, Plaintiffs offer no facts suggesting that Defendant undertook the reorganization to prevent Plaintiffs from receiving earn-out consideration. The reorganization did not directly involve TISCOR and did not result in layoffs of TISCOR's sales force. (Def.'s SUF ¶ 28.) As Plaintiffs note, Defendant's reorganization resulted in increased sales revenue for Brady Corporation. (Compl. ¶ 17.) The success of the reorganization indicates that it was undertaken for valid business reasons, rather than to deprive Plaintiffs of the fruits of earn-out provisions. While Plaintiffs assert that the reorganization made it impossible to achieve the revenue benchmarks set forth in the earn-out provisions, the only specific conduct that Plaintiffs complain of is Defendant's failure to use its sales force to market TISCOR's products. However, as already explained, Defendant had no express or implied obligation to market the products.

Although Plaintiffs cite *O'Tool* for the proposition that there is a certain degree of latitude in defining a breach of the implied covenant, the instant case is distinguishable from *O'Tool*. In *O'Tool*, the defendant plainly engaged in conduct designed to prevent the plaintiff from realizing earn-out consideration, such as changing the brand name of the plaintiff's boats, requiring the plaintiff to bear the costs of producing a new line of boats, and closing plaintiff's manufacturing facility. *See* 387 F.3d at 1191-92. The district court and the Tenth Circuit noted that there was ample evidence that the defendant acquired the plaintiff's business in order to remove a competitor from the market. *Id.* at 1197. Here, Plaintiffs do not allege any facts suggesting that Defendant interfered with the operation of TISCOR. Under the employment agreements incorporated into the Stock Purchase Agreement, Mr. Rumis and Mr. Rubino were in charge of running TISCOR's day-to-day operations. (*See* Rumis Employment Agreement § 3(a); Rubino Employment Agreement § 3(a).) Unlike the circumstances in *O'Tool*, Plaintiffs do not assert that Defendant ordered them to manage their business in a manner that would result in reduced profits. Indeed, Plaintiffs have set forth virtually no facts suggesting that Defendant exerted any degree of control over TISCOR's day-to-day operations. Further, unlike the defendant in *O'Tool*, who sought to eliminate a competitor from the market, there was no obvious economic incentive for Defendant Brady Worldwide to prevent Plaintiffs from achieving an earn-out. As

noted by Defendant, Brady Worldwide and TISCOR sold different types of products and were not competitors. (*See* Mot. for Summ. J. at 3.)  Further, Plaintiffs fail to provide a logical reason why Defendant, which stood to make money if TISCOR was profitable, would want to prevent one of its acquisitions from succeeding.  The Court thus **FINDS** that there is no genuine issue of material fact that Defendant did not act in bad faith.

In sum, because no reasonable trier of fact could find that Defendant was obligated to market TISCOR's products or that Defendant acted in bad faith to prevent TISCOR from reaching its revenue benchmarks, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## *Conclusion*

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**

DATED:  May 21, 2007

_____
HON. NAPOLEON A. JONES, JR.
United States District Judge

cc: All Parties
    Magistrate Judge Stormes